IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–00164–EWN–CBS

CLYDE FREEMAN,
ESTHER LEWIS,
CHERYL McCLENTON,
GLORIA JAMES,
EULUS DENNIS, and
ALTON SMITH,

      Plaintiffs,

v.

ROXANE WHITE,
THE DENVER DEPARTMENT OF HUMAN SERVICES, and
the CITY AND COUNTY OF DENVER,

      Defendants.

---

**ORDER AND MEMORANDUM OF DECISION**

---

This is a civil rights case.  Plaintiffs Clyde Freeman, Ester Lewis,[1] Cheryl McClenton,

Gloria James, Eulus Dennis, and Alton Smith allege that Defendants Roxanne White, in both her

individual and official capacities, the Denver Department of Human Services ("DDHS"), and the

City and County of Denver ("City and County") discriminated against them based on their race in

---

[1]Two Plaintiffs in this case are proceeding *pro se*: (1) Ester Lewis ("*Pro se* Plaintiff Lewis"); and Alton Smith ("*Pro se* Plaintiff Smith").  Plaintiffs Freeman, McClenton, James, and Dennis (collectively "Plaintiffs" or, when necessary, "Represented Plaintiffs") are all represented by the same counsel.

violation of 42 U.S.C. §§ 1981 and 1983 (2006) ("sections 1981 and 1983").  This matter is

before the court on "Defendants' Motion for Summary Judgment," filed October 31, 2005.

Jurisdiction is premised upon federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and

1343 (2006), respectively.

## FACTS

### 1.    Factual Background

#### a.    The Parties

Plaintiffs are six African Americans who formerly worked for DDHS.  (Defs.' Mem. Br. in

Supp. of their Mot. for Summ. J., Statement of Undisputed Facts ¶ 1 [filed Oct. 31, 2005]

[hereinafter "Defs.' Br."]; *admitted at* Pl.'s [sic] Resp. to Defs.' Mot. for Summ. J., Resp. to

Statement of Undisputed Material Facts ¶ 1 [filed Dec. 9, 2005] [hereinafter "Pls.' Resp."].)[2]

Plaintiffs and other DDHS employees were terminated on July 15, 2004 as a result of DDHS

layoffs.  (*Id.*, Statement of Undisputed Facts ¶ 1; *admitted at* Pls.' Resp.,  Resp. to Statement of

Undisputed Material Facts ¶ 1.)  The City and County of Denver is a municipal corporation.  (*Id.*,

Statement of Undisputed Facts ¶ 2; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed

Material Facts ¶ 2.)  Defendants assert that DDHS is a political subdivision of the State of

Colorado.  (*Id.*, Statement of Undisputed Facts ¶ 3; *denied in relevant part at* Pls.' Resp., Resp.

to Statement of Undisputed Material Facts ¶ 3.)  Defendant Roxane White has been the Manager

---

[2]*Pro se* Plaintiffs Lewis and Smith were not parties to the response brief and did not file
their own responses to Defendants' motion.

of DDHS since August 27, 2003.  (*Id.*, Statement of Undisputed Facts ¶ 36; *admitted at* Pls.'

Resp., Resp. to Statement of Undisputed Material Facts ¶ 36.)

> **b.**    ***Workforce Realignment and Reduction***

In April 2004, the state of Colorado rolled out a new human services database called

Colorado Benefits Management System ("CBMS").  (*Id.*, Statement of Undisputed Facts ¶ 5;

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 5.)  The

implementation of CBMS forced DDHS to reorganize and restructure the manner in which it

provided services to its clients.  (*Id.*, Statement of Undisputed Facts ¶ 6; *admitted at* Pls.' Resp.,

Resp. to Statement of Undisputed Material Facts ¶ 6.)  After implementation of CBMS, one

worker could manage a client's entire benefits package; whereas prior to implementation, the

same task could require up to seven workers.  (*Id.*, Statement of Undisputed Facts ¶ 7; *admitted

at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 7.)

In July 2004, DDHS was forced to reduce its workforce due to an eight million dollar

reduction in funding from the state of Colorado.  (*Id.*, Statement of Undisputed Facts ¶ 4;

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 4.)  Together, the

implementation of CBMS and the budget reduction drove DDHS to combine two of its previously

separate divisions: (1) Adult Services; and (2) Family Employment Resources ("FER").  (*Id.*,

Statement of Undisputed Facts ¶ 8; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed

Material Facts ¶ 8.)

c.      *Layoff Rules*

On January 15, 2004, the Denver Career Services Board ("DCSB" or "Career Services Board") adopted new layoff rules with an effective date of March 19, 2004.  (*Id.*, Statement of Undisputed Facts ¶ 14; *deemed admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 14.)[3]  Under the new rules, if an employee's position was abolished, he could

---

[3]Plaintiffs deny this proffer in part, asserting that the rule change "was crafted so that it had an adverse impact on African Americans."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 15.)  In support of their denial, Plaintiffs cite a two-page summary of the findings of their expert witness.  (*Id.*, Ex. 5 at 4–5 [Pls.' Revised Expert Report].)  The court has three initial observations: (1) Plaintiffs' assertion of fact fails to deny Defendants' proffered fact; (2) each of the seventeen paragraphs of the two-page summary that Plaintiffs cite is numbered; and (3) none of those seventeen numbered paragraphs mention the DCSB layoff rule change.  (*Id.*)  Thus, I admonish Plaintiffs for: (1) basing their denial of Defendants' proffer on inapposite factual assertions; (2) failing to follow my procedural rules, which, in the case of documents numbered by paragraphs, require reference to the "specific paragraph" that supports a denial, (*see* Practice Standards—Civil, Special Instructions Concerning Motions for Summary Judgment ¶¶ 2a, 5); (3) misrepresenting the record; and (4) attempting to hide their misrepresentation behind an obtuse record citation.  Thus, Defendants' proffer is deemed fully admitted.

The court further notes with exasperation that Plaintiffs make a habit of responding to Defendants' factual proffers by stating that they deny a fact in part and then offering a factual statement of their own that *does not refute* the substance of Defendants' initial proffer.  Plaintiffs' partial denials are generally along the following lines: if Defendants assert the sky is blue, Plaintiffs deny the assertion in part and state that two fluffy clouds float in the sky.  This is not a denial.  *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 602 (1986) (defining "denial" as "refusal to admit the truth of a statement, charge, or imputation").  Moreover, my procedural rules require Plaintiffs to furnish a *reason why* they deny any factual proffer.  (*See* Practice Standards—Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4 [second emphasis added] ["Any denial shall be accompanied by a *brief* factual *explanation of the reason(s) for the denial*. . . ."]); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1891 (1986) (defining "reason" as "an expression or statement offered as an explanation of a belief or assertion").  In the past, the court has operated smoothly under the assumption that parties can put all of this together on their own.  In the present case, I must emphasize: a denial of a factual proffer *must* offer a *reason* for the denial thereof that *serves to disprove* the denied proffer.  I admonish Plaintiffs for this—and numerous other—non-responsive "denials."  (*See, e.g.*, Pls.' Resp., ¶¶ 30, 32, 37, 38, 41–43, 57, 63, 108.)

"bump" down into a lower position, provided that: (1) he had seniority over the person whose

position he bumped into; and (2) he either previously held the position into which he was

bumping, or the position into which he was bumping was directly below his abolished position in a

"class series" (*i.e.*, a hierarchy of related positions).  (*See id.*, Statement of Undisputed Facts ¶ 16;

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 16; *see also* Defs.'

Br., Ex. A–7 at 13 [Dep. of J. Nimmer, Attachment B: Layoff Rule 14–45].)

     ***d.***     ***The Realignment Spreadsheet***

     In spring 2004, Jay Morein, Director of Business Management at DDHS, created a

spreadsheet to realign the "consolidation codes" for nineteen employees.  (*Id.*, Statement of

Undisputed Facts ¶ 19; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed

Material Facts ¶ 19.)  A "consolidation code" is a category used only for the purposes of a layoff

that "aligns similar job functions or job responsibilities."  (*Id.*, Ex. A–3 at 37 [Dep. of J. Morein].)

Consolidation codes had already been created for the purpose of a round of layoffs that occurred

in 2003.  (*Id.*, Ex. A–3 at 10–11 [Dep. of J. Morein].)  Thus, for the 2004 layoffs, Mr. Morein

only altered the codes for those nineteen employees who had moved to new positions in the

interim.[4]  (*Id.*)  Mr. Morein realigned the nineteen employees into the proper consolidation codes

---

    [4]Plaintiffs deny that the nineteen employees whose positions in the consolidation code Mr. Morein changed were "performing [in 2004] functions that differed from where their positions were reflected within [the 2003] layoff consolidation code."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 19.)  Plaintiffs offer no reason for their denial.  (*See id.*)  I must therefore strike this denial for failure to follow my procedural rules.  (*See* Practice Standards—Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4 [emphasis in original] ["Any denial shall be accompanied by a *brief* factual explanation of the reason(s) for the denial. . . ."].)

before the 2004 layoff to assure that the appropriate "rank order lists"[5] were generated so

bumping rights could be determined.  (*Id.*, Statement of Undisputed Facts ¶ 20; *admitted at* Pls.'

Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.)

Plaintiffs Dennis and James were two of the employees whose consolidation codes Mr.

Morein realigned.  (*Id.*, Statement of Undisputed Facts ¶ 21; *admitted at* Pls.' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 21.)  In October 2003, Plaintiff Dennis voluntarily

transferred to the Family and Children's Division.  (*Id.*, Ex. A–11 at 55, 108 [Dep. of E. Dennis].)

Consequently, Mr. Morein changed Plaintiff Dennis's consolidation code to reflect this new,

permanent position.  (*Id.*, Ex. A–3 at 113–14 [Dep. of J. Morein].)  In November or December

2003, Plaintiff James requested and was granted a transfer to the Business Management Division

to work under Mr. Morein.  (*Id.*, Ex. A–12 at 45 [Dep. of G. James], Ex. A–3 at 26 [Dep. of J.

Morein].)  Consequently, Mr. Morein changed Plaintiff James's consolidation code to reflect this

new, permanent position.  (*Id.*, Ex. A–3 at 27, 114–15 [Dep. of J. Morein].)

### e.      *The Executive Management Team's Layoff Procedures*

Defendant White and her executive team determined the number of positions that needed

to be eliminated in order to balance the DDHS budget to account for the state's budget cuts.  (*Id.*,

Statement of Undisputed Facts ¶ 37; *deemed admitted at* Pls.' Resp., Resp. to Statement of

---

[5]While the parties do not clarify what precisely a "rank order list" is, the court gathers it is a list in which employees who have the same job function are ranked by seniority.  (*See* Defs.' Br., Ex. A–30 at 1 [Partial Rank Order List].)

Undisputed Material Facts ¶ 37.)[6]   Defendant White then instructed her Division

---

[6]Plaintiffs deny this fact in part, asserting that Defendant White and her executive team intended "to eliminate employees that were targeted," presumably meaning DDHS management sought to use the layoff process to discriminate against African-American employees. (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 37 [citing "Ex. 6, James Depo, 64:1–4; Ex. 9, Morein Depo, [sic] 62:22 – 64:17; Ex. 10, Plaintiffs' Depo. Ex. P–71, p.1"]; *see also id.*, Resp. to Statement of Undisputed Material Facts ¶¶ 30, 32 [making the same contention based on the record citation contained in paragraph thirty-seven].)  At the outset, I note that Plaintiffs' denial fails to refute the substance of Defendants' factual proffer.  Nevertheless, I pause to explore Plaintiffs' abject failure to offer record support for this denial because Plaintiffs' failure here is emblematic of Plaintiffs' overall failure throughout the course of their response brief to offer record support for a multitude of their denials and factual assertions.

Plaintiffs cite three exhibits in support their allegations of the executive team's racially discriminatory animus.  None of the exhibits actually supports such allegations.  First, Plaintiffs cite to exhibit six to their own brief, which Plaintiffs assert to be the deposition of Plaintiff James. (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 37 [citing "Ex. 6, James Depo, [sic] 64: 1–4"].)  Exhibit six is the *affidavit* of Plaintiff James.  (*Id.*, Ex. 6 [Aff. of G. James].)  Plaintiffs' exhibit *twelve* includes one page of Plaintiff James's deposition testimony, but not the page to which Plaintiffs cite.  (*See id.*, Ex. 12 [Dep. of G. James].)  Further, the court examined each of the thirty-two other exhibits Plaintiffs submitted along with their response brief.  *None* of the exhibits includes the portion of Plaintiff James's deposition testimony upon which Plaintiffs purport to base their assertion.  (*See id.*, Exs. 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, and 34.)

Second, Plaintiffs cite the deposition testimony of Mr. Morein.  (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 37.)  In the cited portion of his deposition, Mr. Morein states that in discussing the layoff process, he and Defendant White referred to Business Management employees by position and by name, rather than by blindly applying the layoff plan to job classifications within the division.  (*Id.*, Ex. 9 at 64 [Dep. of J. Morein].)  In the cited testimony Mr. Morein does not: (1) mention any Plaintiff in this case; or (2) indicate that any particular DDHS employees were "targeted" for termination based on their race.  (*Id.*, Ex. 9 at 62–64 [Dep. of J. Morein].)  Instead, Mr. Morein relates how he anticipated the 2004 layoff would affect the jobs of certain employees in the Business Management Division, none of whom are parties to the present dispute.  (*Id.*)

Finally, Plaintiffs cite to a document Mr. Morein apparently created in connection with his evaluation of certain employees in his division for the July 2004 layoff.  (*Id.*, Ex. 10 [Bus. Mgmt. Staffing Overview Doc.].)  The document consists of a hierarchical diagram organizing Business Management Division employees by name and position.  (*Id.*, Ex. 10 at 3–4 [Bus. Mgmt. Staffing Overview Doc.].)  The document also: (1) lists the names of three employees, none of whom are parties to this litigation; (2) states that one of the named employee's positions could be abolished

Directors to identify positions within their respective divisions that could be eliminated using the

following guidelines:

1) preserve customer service by eliminating non-case carrying positions rather than case carrying positions which directly served clients of DDHS;
2) maintain a consistent supervisor to supervisee ratio;
3) maintain program functions mandated by law; and
4) determine whether a non-mandated program was losing money.

(*Id.*, Statement of Undisputed Facts ¶ 38; *deemed admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Material Facts ¶ 38.)[7]

### f.    The Layoff Process

Once positions to be eliminated were identified in each division, seniority determined

which employees would have their jobs abolished.  (*Id.*, Statement of Undisputed Facts ¶ 50;

---

on January 5, 2005; and (3) further details the job classifications of the two other named employees, going on to evaluate briefly such employees' job performance. (*Id.*, Ex. 10 at 1 [Bus. Mgmt. Staffing Overview Doc.].)  No inference that race was considered in the document could plausibly be drawn from therefrom.  (*Id.*)

    The court admonishes Plaintiffs' counsel for their abject failure to support their denials with relevant record citations.  Indeed, as this court combed through Plaintiffs' denials and factual contentions, as well as their "supporting" record citations, it began to wonder if Plaintiffs counsel had cited exhibits at random, hoping that chance would yield a case that discovery had not. Plaintiffs' counsel are teetering on the precipice of Rule Eleven sanctions.  *See* Fed. R. Civ. P. 11(b)(3) (emphasis added) ("By presenting to the court . . . a written motion . . . an attorney . . . is certifying that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . .  [the] factual contentions have *evidentiary support* . . . ."); *see also id.* 11(b)(4) (emphasis added) (attorney-submitted motion certifies "the denials of factual contentions are warranted *on the evidence*.").

    [7]Plaintiffs deny this fact in part, sounding a familiar refrain: "[Defendant] White also approved the cuts in order to eliminate employees that were targeted."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 38.)  Plaintiffs rely on two of the three exact record citations discussed and rejected in the immediately preceding footnote.  *See Facts* § 1e, n.6, *supra.*  I reject Plaintiffs' sham denial and deem admitted Defendants' proffer.

*admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 50.)

Additionally, certain positions in a consolidation code could be excepted from elimination if an

employee who held the position held "special qualifications," such as Spanish fluency.  (Pls.'

Resp., Ex. 13 at 72 [Dep. of P. Garritt].)

In making the layoff determinations, DDHS Senior Personnel Analysts used: (1) rank

order lists to determine which employees would have their positions abolished based on seniority;

(2) a class series document to determine whether an employee in an abolished position was

eligible to bump into a lower position; and (3) employee personnel files to determine whether an

employee whose position was abolished previously held any other lower positions for purposes of

bumping.  (Defs.' Br., Statement of Undisputed Facts ¶ 56; *admitted in relevant part at* Pls.'

Resp., Resp. to Statement of Undisputed Material Facts ¶ 56.)  The process of determining

bumping rights was complicated by the fact that decisions made by employees to accept or reject

"demotion appointments" could alter the bumping rights of other employees.  (*Id.*, Statement of

Undisputed Facts ¶ 57; *deemed admitted at* Pls.' Resp., Resp. to Statement of Undisputed

Material Facts ¶ 57.)[8]

Ultimately, the layoff impacted sixty-six DDHS employees, who: (1) were laid off; (2)

were demoted to lower positions; (3) resigned in lieu of layoff; or (4) retired in lieu of layoff.

---

[8]Plaintiffs deny this proffer, stating: "In some cases . . . it was obvious who would be
eliminated."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 57.)  Plaintiffs'
denial is irrelevant to Defendants' proffer and is therefore rejected.

(*Id.*, Statement of Undisputed Facts ¶ 63; *deemed admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Material Facts ¶ 63.)[9]

### g.    *Facts Concerning Plaintiffs Individually*

### i.    *Plaintiff Clyde Freeman*

A committee of employees, facilitated by a State Field Administrator, identified thirty-one

positions in the recently combined Adult Services and FER Division for elimination.  (*Id.*,

Statement of Undisputed Facts ¶ 43; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed

Material Facts ¶ 43.)  At the time of the layoffs, Plaintiff Freeman was the Division Director of

Adult Services.  (*Id.*, Statement of Undisputed Facts ¶ 66; *admitted at* Pls.' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 66.)  Plaintiff Freeman was assigned to her Division

Director position effective April 16, 2003 by the former Manager of DDHS, Donna Good.  (*Id.*,

Statement of Undisputed Facts ¶ 67; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed

Material Facts ¶ 67.)  Valerie Brooks made the decision to eliminate one of two division director

positions in the newly combined FER and Adult Services Division.  (*Id.*, Statement of Undisputed

Facts ¶ 68; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material

Facts ¶ 68.)  Ms. Brooks testified that at the time she made this decision, she did not know

whether Plaintiff Freeman or Juanita Sanchez, the FER Division Director, had more seniority.

---

[9]Plaintiffs deny this fact in part, asserting various factual contentions that do not bear upon the veracity of Defendants' proffer.  (*See* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 63 [appearing to assert that the only relevant set of persons affected by the layoffs were those who were laid off, and not those who were demoted or who resigned or retired in lieu of layoff].)  This denial does not controvert Defendants' initial proffer, which is therefore deemed admitted.

(*Id.*, Ex. A–4 at 50–51, 55 [Dep. of V. Brooks].)  Plaintiff Freeman's position was ultimately

abolished because she had less seniority than Ms. Sanchez.  (*Id.*, Statement of Undisputed Facts ¶

70; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 70.)

> **ii.    Pro se *Plaintiff Ester Lewis and Plaintiff Cheryl McClenton***

A committee of employees, facilitated by a State Field Administrator, identified thirty-one

positions in the Adult Services and FER Division for elimination.  (*Id.*, Statement of Undisputed

Facts ¶ 43; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 43.)

Valerie Brooks made the decision to eliminate three Program Administrator positions in the newly

formed Adult Services and FER Division, one of which was vacant due to a resignation.  (*Id.*,

Statement of Undisputed Facts ¶¶ 77, 79; *admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Material Facts ¶¶ 77, 79.)  *Pro se* Plaintiff Lewis and Plaintiff McClenton were both

laid off because they had less seniority than the other three Program Administrators in their

consolidation group.  (*Id.*, Statement of Undisputed Facts ¶ 80; *admitted at* Pls.' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 80.)

> **(a)    Pro se *Plaintiff Lewis***

In lieu of layoff, *Pro se* Plaintiff Lewis was offered a "demotion appointment" to a lower

position that she had previously held.  (*Id.*, Statement of Undisputed Facts ¶ 81, *deemed

admitted*.)[10]  *Pro se* Plaintiff Lewis rejected the demotion appointment.  (*Id.*, Statement of

Undisputed Facts ¶ 82, *deemed admitted*.)

---

[10]*Pro se* Plaintiff Lewis did not respond to Defendants' motion.  Therefore, I deem
admitted all relevant factually supported allegations concerning *Pro se* Plaintiff Lewis.

### (b)    Plaintiff McClenton

In her role as Program Administrator, Plaintiff McClenton oversaw DDHS's Veteran's Service Program.  (*Id.*, Statement of Undisputed Facts ¶ 84; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 84.)  The duties Plaintiff McClenton performed were mandated by statute, but her position as Program Administrator was not.  (*Id.*, Statement of Undisputed Facts ¶ 87; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 87.)  Plaintiff McClenton admits she had less seniority than the other Program Administrators in her consolidation group.  (*Id.*, Ex. A–34 at 45 [Dep. of C. McClenton].)  For the purpose of bumping rights: (1) Plaintiff McClenton had never held a lower position at DDHS; and (2) no lower position existed in her consolidation code into which Plaintiff McClenton could bump.  (*Id.*, Statement of Undisputed Facts ¶ 91; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 91.)  Program Administrator Doug Golden, a white male, bumped into Plaintiff McClenton's position.  (*Id.*, Statement of Undisputed Facts ¶¶ 93–94; *deemed admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 93–94.)[11]  Doug Golden is a veteran

---

[11]Plaintiffs' deny this fact in part, citing the deposition testimony of Plaintiff McClenton, in which she stated her belief that her status as a veteran accorded her with "special qualifications" such that she should not have been laid off.  (Pls.' Resp., Ex. 21 at 49 [Dep. of C. McClenton].) Plaintiffs offer no evidence that Plaintiff McClenton is qualified to make such a claim.  Moreover, the record reveals no evidence suggesting the assertion is anything other than a self-serving, conclusory statement that fails to give rise to an issue of fact.  (*See* Defs.' Br., Ex. A–7 at 11 [Dep. of J. Nimmer, Attachment B: Layoff Rule 14–42] [explaining the Personnel Director determines whether an employee has "special qualification," which is a "significant and unique skill which cannot readily be learned by another employee"]); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (noting that "unsupported conclusory allegations . . . do not create a genuine issue of fact").  As Plaintiffs' denial is unsupported, I deem admitted Defendants' initial proffer.

with eleven years more seniority than Plaintiff McClenton.  (*Id.*, Statement of Undisputed Facts ¶¶ 88, 93–94; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 88, 93–94.)

Plaintiff McClenton asserts that in November 2002, her supervisor, Karen Miller, told her that other supervisors wanted her to resign.  (Pls.' Resp., Ex. 26 ¶ 15 [Aff. of C. McClenton].)  Plaintiff McClenton cryptically asserts: "There was no reason or justification for that threat or demand other than my race."  (*Id.*, Ex. 26 ¶ 16 [Aff. of C. McClenton].)  In November 2002, Plaintiff McClenton complained to the Mayor of Denver of racial discrimination against her.  (*Id.*, Statement of Additional Disputed Facts ¶ 85; *objected to as irrelevant at* Defs.' Reply in Supp. of their Mot. for Summ. J., Resp. to Statement of Additional Disputed Facts ¶ 85 [filed Jan. 11, 2006] [hereinafter "Defs.' Reply"].)

### iii.  *Plaintiff Gloria James*

Mr. Morein, Director of Business Management, identified three positions in his division for abolishment.  (Defs.' Br., Statement of Undisputed Facts ¶ 44; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 44.)  Mr. Morein selected these three positions for elimination because they were not performing essential functions, were not mandated services, and were not revenue-generating positions.  (*Id.*, Statement of Undisputed Facts ¶ 46; *deemed*

*admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 46.)[12]  Unlike larger

divisions that abolished multiple positions within a job classification, Mr. Morein abolished single

Business Management Division positions in job classifications that were filled by only one person.

(*Id.*, Statement of Undisputed Facts ¶ 48; *admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Material Facts ¶ 48.)  Consequently, Mr. Morein knew the identities of the employees

whose positions he selected for abolishment.  (*Id.*, Statement of Undisputed Facts ¶ 48; *admitted*

*at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 48.)

Plaintiff James was an Analyst Specialist under Mr. Morein's supervision at the time of the

layoffs.  (*Id.*, Statement of Undisputed Facts ¶ 96; *admitted at* Pls.' Resp., Resp. to Statement of

Undisputed Material Facts ¶ 96.)  Plaintiff James requested to be transferred to Mr. Morein's

division and began working there in November or December 2003.  (*Id.*, Statement of Undisputed

Facts ¶ 97; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 97.)

Plaintiff James's position was not in a class series with any lower positions for purposes of

bumping.  (*Id.*, Statement of Undisputed Facts ¶ 102; *deemed admitted at* Pls.' Resp., Resp. to

---

[12]Plaintiffs' deny this fact, asserting: "Mr. Morein changed the consolidation code of Ms. James some [nine] days before the layoffs, intending to have her eliminated in the layoff and knowing that had he not changed the consolidation code she would not have been laid off."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 46 [citing "Ex. 11, Morein Depo, 44:8–24"].)  As with so many of Plaintiffs' denials, this one suffers from multiple deficiencies. First, Plaintiffs direct the court to their *eleventh* exhibit, which is the deposition of Plaintiff Freeman.  (*Id.*, Ex. 11 [Dep. of C. Freeman].)  Mr. Morein's deposition is Plaintiffs' *ninth* exhibit. (*Id.*, Ex. 9 [Dep. of J. Morein].)  Second, while Mr. Morein did state he changed Plaintiff James's consolidation code prior to the layoffs, nothing in the cited record indicates any "intent[] to have [Plaintiff James] eliminated."  (*See id.*, Ex. 9 at 44 [Dep. of J. Morein].)  Instead, Mr. Morein indicates he changed Plaintiff James's code to correct an inaccuracy in the consolidation code alignment.  (*Id.*)  Defendants' initial proffer is therefore deemed admitted.

Statement of Undisputed Material Facts ¶ 102.)[13]  Plaintiff James could not bump into a

previously held position, Contract Compliance Analyst, because she lacked seniority.  (*Id.*, Ex.

A–24 at 1 [6/8/04 White/Brough Letter].)[14]

---

[13]Plaintiffs deny this fact in part, asserting Plaintiff James "did not voluntarily seek to change her position from Contract Compliance (on special assignment) to Analyst Specialist in [the Business Management Division]."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 102.)  I reject Plaintiffs' assertion for failure to cite to the record, as required by my procedural rules.  (*See* Practice Standards—Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4 [emphasis in original] ["Any denial (in a brief in opposition to summary judgment) shall be accompanied by a brief factual explanation of the reason(s) for the denial and a *specific reference* to material in the record supporting the denial."].)  In their denial, Plaintiffs' further allege that Mr. Morein changed Plaintiff James's position with the approval of Defendant White.  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 102.)  This allegation is unsupported by the record to which Plaintiffs cite.  (*See id.*, Ex. 9 at 26–27 [Dep. of J. Morein] [failing even to mention Defendant White].)  Defendants' initial proffer is therefore deemed admitted.

[14]Plaintiffs deny Defendants' proffer based on this letter, alleging that had Mr. Morein not changed Plaintiff James's code, she would not have been laid off.  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 101 [citing Pls.' Resp., Ex. 6 ¶ 23 [Aff. of G. James].)  Specifically, Plaintiff James's affidavit states:

> I had more continuous length of service than at least one, if not two, of the two women who worked under me previously and whose job she [sic] had performed. Had I not been transferred out of my original position, or if I had been kept on her [sic] 'special assignment' she [sic] would have had more seniority than one and could have bumped into her [sic] position, but having job assignments changed, she [sic] was placed into a position where her job was abolished.

(*Id.*, Ex. 6 ¶ 23 [Aff. of G. James].)  I reject this statement because it: (1) is incoherent; (2) appears to be entirely conclusory, at least to the limited extent it can be deciphered; (3) does not appear to be based on personal knowledge; (4) fails to demonstrate affirmatively that Plaintiff James is competent to testify on the stated matters; and (5) does not appear on its face to be a statement made by Plaintiff James.  *See* Fed. R. Civ. Pro. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

In March or April 2003, Plaintiff James complained of racial discrimination when she perceived the cords of window coverings near her work area to have been tied into a noose.[15] (Pls.' Resp., Ex. 29 at 1 [4/18/03 Investigation Letter].)  DDHS investigated the complaint and completed a report, which included photographs of the cords, concluding the cords were "tangled and [] not configured in the form of a noose."  (*Id.*, Ex. 29 at 1–2 [4/18/03 Investigation Letter].)

On an unspecified date, Plaintiff James states she met with Defendant White to complain about "the way in which I was being treated, as I had been punitively transferred to a clerical job . . . had my supervisory duties removed, and had been improperly disciplined and put on unpaid leave on more than one occasion."  (*Id.*, Ex. 6 ¶ 18 [Aff. of G. James].)  Plaintiff James asserts that nothing happened as a result of her meeting with Defendant White.  (*Id.*, Ex. 6 ¶¶ 18–19 [Aff. of G. James].)

### iv.    *Plaintiff Eulus Dennis*

A committee of eight employees, facilitated by a State Field Administrator, identified twenty-eight positions in the Family and Children's Division for elimination.  (Defs.' Br., Statement of Undisputed Facts ¶ 41; *deemed admitted at* Pls.' Resp., Resp. to Statement of

---

[15]Plaintiffs allege approximately fifty additional facts concerning Plaintiff James.  (*See* Pls.' Resp., Statement of Additional Disputed Facts ¶¶ 95–146.)  The court has reviewed each of these facts—most of which relate to disciplinary actions against Plaintiff James well prior to her layoff—and finds that the vast majority are not relevant to the issues on summary judgment because they do not raise allegations of racial discrimination.  (*See id.*)  The court fails to see how such proffers might serve to undercut Defendants' claims in this case.  (*See* Practice Standards—Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 5 [nonmoving party's additional facts shall set forth proffers that "undercut [the] movant's claim that he is entitled to judgment as a matter of law"].)

Undisputed Material Facts ¶ 41.)[16]  The committee identified the positions it eliminated not by the names of the persons who held a particular position, but by job title.  (*Id.*, Statement of Undisputed Facts ¶ 42; *deemed admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 42.)  The Program Administrator position Plaintiff Dennis held was one of the twenty-eight positions so identified for elimination.  (*Id.*, Statement of Undisputed Facts ¶ 108; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 108.)

On unspecified dates, Plaintiff Dennis contends he was discriminated against when his supervisor, Chrisanne Wilhelmi, took an unusual step by "br[inging] someone in from the human resources department to sit in on [Plaintiff Dennis's] supervision meetings."  (Pls.' Resp., Ex. 7 at 115 [Dep. of E. Dennis].)  Plaintiffs proffer certain facts purportedly based upon the deposition testimony of Ms. Wilhelmi.  (*Id.*, Statement of Additional Disputed Facts ¶¶ 152–53 [citing "Ex.

---

[16]Plaintiffs deny this fact in part, non-responsively asserting: "Supervisors acknowledged that given common sense and their general understanding of who had seniority they pretty well knew who would be affected by the layoffs."  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 41.)  In support of their denial, Plaintiffs cite to the testimony of *one Plaintiff* concerning her impression prior to the layoffs of how her job would be impacted by the layoffs, which turned out to be incorrect.  (*Id.*, Resp. to Statement of Undisputed Material Facts ¶ 41 [citing Ex. 11 at 27–28 (Dep. of C. Freeman)].)  I reject Plaintiffs' denial for lack of record support.  Plaintiffs make the identical assertion based on the same citation in their partial denials of further proffers made by Defendants.  (*See id.*, Resp. to Statement of Undisputed Material Facts ¶¶ 40, 42.)  I deem admitted each of Defendants' proffers that Plaintiffs so deny.  (*See* Defs.' Br., Statement of Undisputed Facts ¶¶ 41–43.)

33, Wilhelmi Depo, 52:4–23"].)[17]  In October 2003, Plaintiff Dennis wrote a letter to the Mayor

of Denver complaining that DDHS managers had discriminated against him on the basis of his

age, race, and gender.  (*Id.*, Ex. 7 at 55–56 [Dep. of E. Dennis].)  Plaintiff Dennis admitted that

Defendant White was not one of the managers against whom he leveled his complaints.  (*Id.*, Ex.

7 at 57 [Dep. of E. Dennis].)

> ### *v.*    **Pro se** *Plaintiff Smith*

The Director of Information Technology ("IT"), Mark Brazwell, who is African

American, evaluated the business functions performed in his division and identified six positions to

be abolished.  (Defs.' Br., Statement of Undisputed Facts ¶ 39, *deemed admitted*.)[18]  Mr. Brazwell

did not know the names of the employees who would ultimately be affected by his decision to

eliminate positions in IT.  (*Id.*, Statement of Undisputed Facts ¶ 40, *deemed admitted*.)

Mr. Brazwell decided to abolish an Associate IT Developer position in his division.  (*Id.*,

Statement of Undisputed Facts ¶ 112, *deemed admitted*.)  His decisions to eliminate this and other

positions were based on the business functions performed by the positions, not on the employees

---

[17]I reject these proffers.  Once again, Plaintiffs would send this court on a snipe hunt: the
exhibit to which Plaintiffs cite is not Ms. Wilhelmi's deposition.  (Pls.' Resp., Ex. 33 [Grievance
Form].)  I endorse Defendants' response to Plaintiffs' proffer: "Defendants object that none of
Plaintiffs' exhibits are labeled, and it is not Defendants' responsibility to repeatedly sort through
unlabeled exhibits looking for a record citations."  (Defs.' Reply, Resp. to Statement of
Additional Disputed Facts ¶ 152.)  Defendants offer an all-too-appropriate observation: "'Judges
are not like pigs hunting for truffles buried in the record.'  Defense counsel are not like pigs
either . . . ."  (*Id.* [quoting *Roger Whitmore's Auto Servs. v. Lake County*, 424 F.3d 659, 664 (7th
Cir. 2005)].)  I agree.

[18]*Pro se* Plaintiff Smith did not respond to Defendants' motion.  Therefore, I deem
admitted all relevant factually supported allegations concerning *Pro se* Plaintiff Smith.

who may have held those positions.  (*Id.*, Statement of Undisputed Facts ¶ 113, *deemed admitted*.)  *Pro se* Plaintiff Smith, whose position was eliminated, had the shortest length of service of the six Associate IT Developers.  (*Id.*, Statement of Undisputed Facts ¶ 114, *deemed admitted*.)

> **h.    Defendant White**

Plaintiffs allege in their complaint that Defendant White, the Manager of DDHS, "made comments that she wanted to use the layoffs to 'clean house' and that she was not concerned about the black employees and only worried about the reaction of the Hispanic employees." (Compl. ¶ 26 [filed Jan. 31, 2005].)  Plaintiffs Dennis, McClenton, and James as well as *Pro se* Plaintiffs Smith and Lewis all admitted during discovery that they never heard Defendant White make such a statement.  (Defs.' Br., Statement of Undisputed Facts ¶ 117; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 117.)  Plaintiff Freeman, the only remaining Plaintiff, testified that she did not hear Defendant White make such a statement, but that she had heard "from other employees" that Defendant White had made such a statement in an e-mail that Plaintiff Freeman never saw.[19]  (*Id.*, Statement of Undisputed Facts ¶ 119; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 119.)

---

[19]Thus, Plaintiffs have failed to provide anything other than inadmissible hearsay to confirm the allegation contained in paragraph twenty-six of their complaint.  *See* Fed. R. Evid. 801(c) (2006).

i.      *Organizational Note: DDHS*

In January 1999, DDHS employees were transferred from the state-run employee merit system and into a merit system run by the City and County of Denver.  (Pls.' Resp., Statement of Additional Disputed Facts ¶ 12; *admitted at* Defs.' Reply, Resp. to Statement of Additional Disputed Facts ¶ 12.)

**2.      *Procedural History***

On January 31, 2005, Plaintiffs filed a complaint in this court.  (Compl.)  Plaintiffs alleged Defendants, in connection with the July 2004 DDHS layoffs, violated: (1) Plaintiffs' due process rights, equal protection rights, and property interests; and (2) section 1981, which prohibits, *inter alia*, racial discrimination in connection with the termination of contractual relationships.  (Compl. ¶¶ 127–29, 132.)  Subsequently, Defendants filed an answer, amended answer, and second amended answer.  (Answer [filed Feb. 24, 2005]; Am. Answer [filed Mar. 9, 2005]; Second Am. Answer [filed Mar. 15, 2005].)  On October 31, 2005, Defendants filed a motion for summary judgment, arguing: (1) DDHS is immune from liability as an arm of the state shielded by the Eleventh Amendment; (2) Plaintiffs' claims against the City and County of Denver fail because there was no municipal policy or custom of discrimination; (3) Defendant White is entitled to qualified immunity; (4) Plaintiffs cannot prove their claims of racial discrimination as to any Defendant; (5) Plaintiffs' disparate impact claims are not cognizable under sections 1981 and 1983; and (6) Plaintiffs' due process claims lack merit.  (Defs.' Br. at 20–33.)  Represented Plaintiffs Freeman, McClenton, James, and Dennis filed their response on December 9, 2005. (Pls.' Resp.)  Therein, Represented Plaintiffs abandoned any claim for relief for alleged violations

of their due process rights. (*Id.* at 53.) *Pro se* Plaintiff Lewis and *Pro se* Plaintiff Smith did not file response briefs. On January 11, 2006, Defendants filed their reply. (Defs.' Reply.)

**ANALYSIS**

***1. Legal Standard***

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2006). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      Evaluation of Claims**

As stated above, Defendants move for summary judgment on the following grounds: (1) Defendant DDHS is immune from liability as an arm of the state under the Eleventh Amendment; (2) Plaintiffs' claims against the City and County of Denver fail because there was no municipal policy or custom of discrimination; (3) Defendant White is entitled to qualified immunity; (4) Plaintiffs cannot prove their claims of racial discrimination as to any Defendant; (5) Plaintiffs' disparate impact claims are not cognizable under section 1981 or section 1983; and (6) Plaintiffs' due process claims lack merit.  (Defs.' Br. at 20–33.)  For the reasons set forth below, the court agrees with Defendants' first, second, and third arguments.  Accordingly, it does not reach Defendants' further arguments for summary judgment.

In the interest of appropriately weighing the claims of *Pro se* Plaintiffs Dennis and Lewis, I evaluate the impact of Defendants' motion for summary judgment upon Represented Plaintiffs' claims separately from the impact of the motion on *Pro se* Plaintiffs' claims.  (*See Analysis* § 2a, *infra* [addressing Represented Plaintiffs' claims]; *Analysis* § 2b, *infra* [addressing *Pro se* Plaintiffs' claims].)  Thus, when the court mentions "Plaintiffs" in the section immediately below, the court refers only to Represented Plaintiffs (*i.e.*, Plaintiffs Freeman, McClenton, James, and Dennis).

      *a.*     *Represented Plaintiffs' Claims*

      *i.*     *Arm of the State Analysis: DDHS*

Defendants contend DDHS is entitled to summary judgment because it is an "arm of the state" such that the Eleventh Amendment shields it from liability under sections 1981 and 1983. (Defs.' Br. at 21–22.)  Plaintiffs do not dispute that this court previously determined Colorado county health and human services departments to be arms of the state, but instead argue that such cases are now invalid because intervening legislation has dictated that county departments are not arms of the state when acting on employment-related matters.  (Pls.' Resp. at 38–40.)  For the reasons set forth below, I reject Plaintiffs' argument and find that DDHS is in all cases an arm of the state for purposes of Eleventh Amendment immunity.

      "If applicable, the Eleventh Amendment bars suits against states in federal court."  *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1231–32 (10th Cir. 1999) (citing *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1419 [10th Cir.1997]).  Only a state or an arm of a state may assert the Eleventh Amendment as a defense to suit in federal court.  *Id.* at 1232 (citation omitted).  If DDHS is an arm of the state of Colorado, then there is no question that the Eleventh Amendment shields it from liability under sections 1981 and 1983.  *See Rozek v. Topolnicki*, 865 F.2d 1154, 1158 (10th Cir. 1989) (citing *Quern v. Jordan*, 440 U.S. 332 [1979]) ("Congress did not abrogate the states' Eleventh Amendment immunity when it enacted [section] 1983."); *Robinson v. Bd. of Regents of the Univ. of Colo.*, 390 F. Supp. 2d 1011, 1016 (D. Colo. 2005) (citing *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1196 [10th Cir. 1998]) (further

citations omitted) ("[I]t is well-settled in the Tenth Circuit that Congress did not waive states' Eleventh Amendment immunity through . . . section 1981.").

Whether a particular governmental entity is an arm of the state is determined by applying the four "*Mount Healthy* factors:" (1) the characterization of the governmental unit under state law; (2) the guidance and control exercised by the state over the governmental unit; (3) the degree of state funding received; and (4) the governmental unit's ability to issue bonds and levy taxes on its own behalf. *Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1559 (10th Cir. 1992), *modified on other grounds on reh'g*, 995 F.2d 992, 994 (10th Cir. 1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 [1977]).  Governmental entities that do not satisfy the *Mount Healthy* analysis are commonly referred to as "political subdivisions."  *See Sturdevant v. Paulsen*, 218 F.3d 1160, 1165 (10th Cir. 2000).

Although the Tenth Circuit has yet to pass on the issue, courts in this district have repeatedly applied the *Mount Healthy* factors to hold that Colorado county human services departments are arms of the state under the Eleventh Amendment.  *See, e.g.*, *Rodriguez v. City & County of Denver*, Civ. No. 01-RB-962 at 5 (D. Colo. Feb. 7, 2003) (holding that DDHS is an arm of the state entitled to Eleventh Amendment immunity against employment discrimination claims brought under sections 1981 and 1983); *Pierce v. Delta County Dept. of Soc. Srvs.*, 119 F. Supp. 2d 1139, 1148 (D. Colo. 2000) (Nottingham, J.) (adopting the reasoning of *Wigger v. McKee*, 809 P.2d 999, 1002–04 [Colo. Ct. App. 1990], which determined that the Arapahoe

County Department of Social Services was an arm of the state of Colorado);[20] *Cobb v. City & County of Denver*, 761 F. Supp. 105, 106 (D. Colo. 1991) (citing *Hidahl v. Gilpin County Dept. of Soc. Srvs.*, Civil Action No. 88-C-1537, Slip Op. [D. Colo. Dec. 11, 1990]; *Oyler v. City & County of Denver*, 1990 WL 134485, Civ. No. 90-A-1255 [D. Colo. Sept. 13, 1990]) ("[M]unicipal departments of social services are in reality arms of the state and therefore immune from suit in federal court.").

Moreover, a long line of state precedent confirms that county departments of human services are mere agencies and divisions of the State Department of Human Services. *Bd. of County Comm'rs v. State Bd. of Soc. Servs.*, 528 P.2d 244, 247–48 (Colo. 1974); *see also Gilman v. State*, 932 P.2d 832, 835 (Colo. Ct. App. 1996), *rev'd on other grounds*, 949 P.2d 565 (Colo. 1997) ("The county departments are functional divisions of the state department for the convenient administration of the state program and are not independent entities separate and distinct from the state."); *Cobbin by Cobbin v. City & County of Denver*, 735 P.2d 214 (Colo. Ct. App. 1987) (holding state's power over social services departments, which engage matters of statewide concern, prevails over those reserved to City and County of Denver); *Nadeau v. Merit Sys. Council*, 545 P.2d 1061, 1062 (Colo. Ct. App. 1975) (same). Nevertheless, for the sake of thoroughly, I revisit the application of the *Mount Healthy* factors to determine DDHS's status under the Eleventh Amendment.

---

[20]In 1994, the Colorado Legislature re-designated what were formerly referred to as state and county departments of "social services" as departments of "human services." *See* Colo. Rev. Stat. § 26–1–105.5(1)(a) (2006).

-26-

The first two *Mount Healthy* factors direct the court to consider the degree of state control over DDHS. *Mt. Healthy*, 429 U.S. at 280; *Ambus*, 975 F.2d at 1559.   I find that Colorado law explicitly provides for broad state control over DDHS.  First, Colorado statutory provisions concerning the duties of county departments of human services explicitly designate such departments as "agents of the state department [of human services]." Colo. Rev. Stat. § 26–1–118(1) (2006); *Nadeau*, 545 P.2d at 1062 (citing Colo. Rev. Stat. 26–1–118) ("The county departments of social services are designated by statute as agents for the State Department of Social Services for the administration of public assistance and welfare-related activities in the respective counties.").  Further, county departments of social services are bound to act "in accordance with the rules and regulations of the state department."  Colo. Rev. Stat. § 26–1–118(1) (2006); *see also id.* § 26–1–118(2) ("The county departments . . . shall report to the state department at such times and in such manner and form as the state department may from time to time direct."); *id.* § 26–1–119 *et seq.* (setting forth further provisions that place county departments squarely within the purview of the state department of human services).  Thus, the statutory provisions governing county departments of human services accord such departments with very few powers independent of the state. *Wigger*, 809 P.2d at 1004.  Consequently, as noted above, Colorado state appellate courts have consistently held that county departments of human services are "'functional divisions of the State Department of [Human] Services for the convenient administration of the state program and are not independent entities separate and distinct from the state.'" *Id.* (quoting *Nadeau*, 545 P.2d 1061).

The third *Mount Healthy* factor directs the court to determine whether a judgment against DDHS would be paid out of the state treasury.  *Mt. Healthy*, 429 U.S. at 280; *Ambus*, 975 F.2d at 1559.  Two facts cut in favor of such a finding.  First, the state fisc is the predominant source of funding for DDHS: eighty percent of the overall cost of the programs administered by the county departments comes from the state department of human services.  Colo. Rev. Stat. § 26–1–123(1) (2006); *Pierce*, 119 F. Supp. 2d at 1148; *Wigger*, 809 P.2d at 1004.  Additionally, no statutory provision exists for allowing social services departments to use their own funds to satisfy money judgments awarded against them.  *Pierce*, 119 F. Supp. 2d at 1148; *Wigger*, 809 P.2d at 1004.  Nevertheless, the state law issue as to the ultimate liability for any judgment against DDHS remains uncertain.  *See Wigger*, 809 P.2d at 1104 (stating "it appears that" county departments would look to the state treasury to satisfy monetary judgments against them).  Defendants' briefs offer nothing to clarify the matter.  (*See* Defs.' Br.; Defs.' Reply.)  Plaintiffs' assertion that they seek judgment against DDHS and not the state resolves nothing.  (*See* Pls.' Resp. at 40.)  Regardless, the court finds that because the other *Mount Healthy* factors cut decisively in favor of Eleventh Amendment immunity for DDHS, the state law question of the ultimate liability for a money judgment against DDHS need not be definitively resolved.  *See Sturdevant*, 218 F.3d at 1166 (declining "to address further the ambiguities attendant upon the question of legal liability for a judgment" where the other *Mount Healthy* "factors decisively resolve[d] the question in favor of Eleventh Amendment immunity"); *accord Sutton*, 173 F.3d at 1233.

The final *Mount Healthy* factor directs the court to determine whether DDHS can issue bonds and levy taxes on its own behalf. *Mt. Healthy*, 429 U.S. at 280; *Ambus*, 975 F.2d at 1559. Indeed, Colorado law indicates departments of human services themselves have no power to issue bonds or levy taxes on their own behalf. *See* Colo. Rev. Stat. § 26–1–125(1) (2006) (requiring boards of county commissioners to make human services levies).

In view of the broad control the state has over DDHS pursuant to explicit statutory provisions, the funding DDHS receives from the state, DDHS's lack of power to levy taxes, and the consistent rulings by this court and state courts that such departments are arms of the state, I find that DDHS is an arm of the state of Colorado. Therefore, DDHS is entitled to Eleventh Amendment immunity.

Confronted with this well-settled conclusion, raised in Defendants' brief, Plaintiffs seek to distinguish their case by contending that all pre-2001 cases "finding a county service department to be an arm of the state have been legislatively overruled . . . with respect to employment related issues." (Pls.' Resp. at 39.) Plaintiffs base their argument upon a 2001 Colorado statute that transferred management of "merit system[s] for the selection, retention, and promotion" of human services employees from the Colorado Department of Human Services to the individual Colorado counties. (*Id.* at 37 [citing Colo. Rev. Stat. § 26–1–120(1)].) Thus, Plaintiffs attempt to distinguish *Pierce* and *Wigger*, which addressed Eleventh Amendment immunity in the context of the administration and delivery of social services, from the present case, which addresses the "selection, retention, and promotion of employees of the county departments" of human services.

(*Id.* at 38–39.)  Tellingly, Plaintiffs fail to cite any case law recognizing the distinction they invite

this court to draw.  (*See id.* at 37–40.)

The Tenth Circuit recently rejected an argument in favor of such a distinction.  In

*Sturdevant v. Paulsen*, the court examined, in the context of applying the *Mount Healthy* factors,

whether an employment discrimination judgment against the Colorado State Board for

Community Colleges and Occupational Education would be paid out of the state treasury.  218

F.3d at 1165.  The Board claimed that any judgment against it in favor of the plaintiff would be

satisfied by a state risk-management fund, but the plaintiff argued that her claim was not covered

by the state fund.  *Id.*  The court rejected the plaintiff's position because it "necessarily relie[d] on

the proposition that the details of [the] risk management fund can render a particular state entity

an arm of the state for purposes of certain claims and a political subdivision for purposes of other

claims."  *Id.*  The court went on to state: "we do not consider such a distinction consistent with

the fundamental goal of the *M[ount] Healthy* analysis: distinguishing political subdivisions from

governmental entities that are effectively arms of the state."  *Id.* (citing *Mt. Healthy*, 429 U.S. at

280).  Thus, the Tenth Circuit has rejected the very distinction upon which Plaintiffs' argument is

predicated.[21]

---

[21]Plaintiffs' unprecedented argument would jettison the holistic *Mount Healthy* analysis, which weighs multiple factors to determine the overall degree of control that the state exerts over a governmental unit, in favor of a piecemeal approach to Eleventh Amendment immunity, which would allow a plaintiff to draw a state entity into court on the basis of relatively a minor degree of municipal control over of certain aspects of the administration of the entity.  Indeed, such an approach would rend the fabric of state sovereignty.  *See generally Principality of Monaco v. State of Mississippi*, 292 U.S. 313, 322–23 (1934) (quoting THE FEDERALIST, No. 81) (footnote omitted) (stating the "States of the Union, still possessing attributes of sovereignty, shall be

Judge Blackburn's unpublished opinion in *Rodriguez* also rejected such a distinction. *Rodriguez*, Civ. No. 01-RB-962. Indeed, the plaintiff in *Rodriguez* made practically the same argument as Plaintiffs in the instant case: in asserting her claims of age and racial discrimination under sections 1981 and 1983, the *Rodriguez* plaintiff noted that DDHS personnel decisions were "made in accordance with rules adopted by the Denver Career Service Board." Civ. No. 01-RB-962 at 4. Thus, the plaintiff asserted that such municipal control indicated that "DDHS should not be treated as an arm of the state with respect to personnel decisions." *Id.* at 4–5. The court flatly rejected the plaintiff's argument, stating that "DDHS cannot be an arm of the state for some purposes and not for others." *Id.* at 5.

In light of the clarity of Eleventh Amendment precedent running contrary to Plaintiffs' position, I am compelled to reject Plaintiffs' contention that DDHS is an arm of the state of Colorado for purposes of administering and delivering social services, but is a political subdivision for the purposes of personnel decisions. The Eleventh Amendment determination yields no shades of grey: a governmental entity is *either* an arm of the state *or* it is a political subdivision. Consequently, Plaintiffs' claims against DDHS are barred by the Eleventh Amendment and must therefore be dismissed.

This holding extends to Plaintiffs' claims against Defendant White in her official capacity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989) (citation omitted) ("A suit against a state official in his or her official capacity is not a suit against the official but rather is a

---

immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention'").

suit against the official's office.  As such, it is no different from a suit against the State itself.").

Further, neither "a governmental entity that is an arm of the state for Eleventh Amendment

purposes[] nor a state official who acts in his or her official capacity[] is a 'person' within the

meaning of [section] 1983."  *Harris v. Champion*, 51 F.3d 901, 905–06 (10th Cir. 1995) (citing

*Will*, 491 U.S. at 70–71).  Finally, the Tenth Circuit recently held "claims against state actors for

[section] 1981 violations must be brought under [section] 1983."  *Bolden v. City of Topeka*, 441

F.3d 1129, 1137 (10th Cir. 2006).  Thus, if a defendant is not a section 1983 "person," then such

defendant cannot be sued thereunder for violation of section 1981.  Consequently, Plaintiffs'

section 1981 claims against DDHS and Defendant White (in her official capacity) fall along with

Plaintiffs' section 1983 claims against the same parties.[22]

### ii.   *Municipal Liability: The City and County of Denver*

#### (a)   *Plaintiffs Have Failed to Aver Facts Sufficient to Hold the City and County Liable Under Section 1983*

According to Defendants, Plaintiffs failed to demonstrate that the City and County of

Denver had either an official policy or an official custom that violated Plaintiffs' rights, as required

for an action under section 1983.  (Defs.' Br. at 23–24.)  Section 1983 provides:

> Every person, who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States . . . to the deprivation of any rights, privileges, or immunities secured
> by the Constitution and laws, shall be liable to the party injured. . . .

---

[22]For further discussion of the interplay between sections 1981 and 1983, see *Analysis* §
2a[ii](b), *infra*.

42 U.S.C. § 1983 (2006).  To establish a claim under section 1983, a plaintiff must prove: (1) a deprivation of a federal or constitutional right by (2) a "person" acting under color of state law.[23] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).  Because municipalities and other local government bodies are "persons" with the meaning of section 1983, they may be held liable under the statute.  *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 689 (1978).  A municipality may not be held liable, however, solely because it employs a tortfeasor; there is no *respondeat superior* liability under section 1983.  *Id.* at 692.  "It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under [section] 1983."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (first alteration in original) (citation omitted) (internal quotation marks omitted).

Plaintiffs concede the City and County of Denver did not have an official policy that inflicted the injuries they allege, and instead assert their case "is an official custom case with multiple bad acts against multiple plaintiffs."  (Pls.' Resp. at 43.)  Thus, Plaintiffs must prove three elements to establish their claims against the City and County of Denver for a discriminatory custom.  First, they must show "[t]he existence of a continuing, persistent and widespread practice of unconstitutional misconduct by [DDHS] employees."  *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).  Second, they must prove there was "[d]eliberate indifference to or tacit approval of [DDHS] misconduct by the [City and County's] policymaking officials . . . after notice to the officials of that particular misconduct."  *Id.*  Third, Plaintiffs must

---

[23]The parties do not dispute that the City and County of Denver is a "person acting under color of state law."

establish "[t]hat [they] w[ere] injured by virtue of the unconstitutional acts pursuant to the [City and County's] custom and that the custom was the moving force behind the unconstitutional acts." *Id.* For the reasons stated below, I find Plaintiffs failed to present evidence sufficient to raise an issue of fact with respect to the second and third elements required to establish a discriminatory custom by the City and County of Denver.

With respect to the first element, Plaintiffs assert there was an official custom of race discrimination within DDHS that lead to their layoffs. (Pls.' Resp. at 41.) Plaintiffs confuse their burden: in the present context, they need not prove *DDHS* had an unconstitutional custom of race discrimination, but rather "the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by [DDHS] employees." *Gates*, 996 F.2d at 1041. Plaintiffs do obtusely assert, without citation to the record, that DDHS

> [m]anagers and supervisors . . . engaged in . . . mistreatment of . . . [P]laintiffs, moving, or forcing the movement of each . . . [P]laintiff around to other job titles, codes and divisions within DDHS, pursuant to no identified formal policy or rule of the City, based on race, and in detriment to their seniority, which directly resulted in their layoff.

(Pls.' Resp. at 44.) It bears repeating: "unsupported conclusory allegations . . . do not create a genuine issue of fact." *Annett*, 371 F.3d at 1237. Rather than venture into the myriad ambiguous issues of causation, intent, and proof that inhere in the vast left-field conspiracy Plaintiffs allege, the court will assume for present purposes, without deciding, that Plaintiffs have come forward with sufficient evidence to raise an issue of fact as to the existence of a "continuing, persistent, and widespread" DDHS scheme of knowingly and unlawfully transferring or causing Plaintiffs to

request transfers into positions DDHS management knew would be abolished in the July 2004 layoffs.[24]

Notwithstanding this generous assumption in Plaintiffs' favor, Plaintiffs fail by any further stretch of the imagination to come forward with evidence sufficient to raise an issue of fact regarding the second element required to establish a discriminatory municipal custom, which tasks Plaintiffs with proof of "[d]eliberate indifference to or tacit approval of [DDHS] misconduct by the [City and County's] policymaking officials . . . after notice to the officials of that particular misconduct." *Gates*, 996 F.3d at 1041. Plaintiffs allege, without record citation, "[t]here was no review of the[] 'small decisions' [*i.e.*, Plaintiffs' transfers] that ultimately led to [P]laintiffs' layoffs, nor opportunity for appeal." (Pls.' Resp. at 44.) Again, Plaintiffs's failure to cite the record leaves only their conclusory statements to refute Defendants' motion. Plaintiffs' unsupported statements cannot suffice to raise an issue of fact for summary judgment. *Annett*, 371 F.3d at 1237. Morever, evidentiary issues aside, while Plaintiffs may well be correct that there was "no review" of DDHS employment decisions made prior to the layoffs, Plaintiffs cannot gloss over the fact that: (1) such review was available; and (2) Plaintiffs abandoned their endeavors to seek such review. It is undisputed that all Plaintiffs were advised in their respective layoff notices of their right to appeal their layoffs to the Denver Career Services Board. (Defs.' Br., Statement of Undisputed Facts ¶ 122; *admitted at* Pls.' Resp., Resp. to Statement of

---

[24]The court notes Plaintiffs do not allege that Plaintiff McClenton was ever transferred during her tenure at DDHS. (*See* Compl.; Pls.' Resp.) Thus, it appears Plaintiffs abandon Plaintiff McClenton's claims against the City and County.

Undisputed Material Facts ¶ 122.)  Plaintiffs themselves admit that they did initially appeal their layoffs to the Denver Career Services Board, but they later withdrew their appeals because the DCSB "may only grant back pay and reinstatement and not the panoply of remedies and relief available under [sections] 1981 and 1983."  (Pls.' Resp. at 44.)  While the court recognizes Plaintiffs' entitlement to seek redress in the forum of their choice, their choice of forum nevertheless bears upon their claims against the City and County of Denver.  Indeed, absent evidence that anyone involved with the Denver Career Services Board appeals process was somehow aware of or complicit with the nefarious job-shuffling scheme Plaintiffs allege, *see Gates*, 996 F.2d at 1041, the court views the existence of the appeals process as evidence cutting against Plaintiffs' assertion of a municipal custom that somehow endorsed any discrimination that may have taken place at DDHS.

Plaintiffs make a number of further statements that could be said to bear upon the second element they must prove in order to demonstrate an unconstitutional official custom on the part of the City and County of Denver.  First, without citation to the record, Plaintiffs assert:

> [T]he very fact that the City [and County of Denver] has been sued at least once before for letting the [d]irector of a [d]epartment shuffle people around with impunity (*Sekerak*) [sic] indicates awareness of the substantial likelihood of such conduct resulting in discrimination, and that Plaintiffs have met their burden of showing a "custom," as to the City.

(Pls.' Resp. at 42–43 [citing *Sekerak v. City & County of Denver*, 1 F. Supp. 2d 1191, 1199 (D. Colo. 1998)].)  In the interest of judicial economy, the court only addresses those aspects of this cornucopia of illogic and misdirection necessary to dispatch it.  First, the court fails to see how *Sekerak*, a *1998* lawsuit arising out of claims of political retaliation and sexual harassment in the

*Denver Police Department*, bears upon the City and County's awareness of any "shuffling" going on within DDHS in 2003 or 2004. *See Sekerak*, 1 F. Supp. at 1194–95. Moreover, Plaintiffs have failed come forward with (let alone cite in the context of their argument) any evidence that the City and County of Denver was aware of the alleged discriminatory "shuffling around" of Plaintiffs when it was taking place. (*See* Pls.' Resp., *passim.*) Without any evidence that the City and County was aware of the alleged "shuffling," Plaintiffs cannot prove the City and County was deliberately indifferent to or tacitly approving of such misconduct. *See Gates*, 996 F.2d at 1041.

Plaintiffs trudge on, offering what the court will generously construe as an attempt to clarify the amorphous contours of the municipal custom as to which they claim to have met their burden of proof:

> The City . . . engaged in its own custom of allowing [d]irectors to create victims of what has been called the "heavy-handed uses of the spoils system." The City had actual knowledge that [d]irectors and/or supervisors of [d]ivisions had used their positions to engage in deprivation of civil rights.

(Pls.' Resp. at 45 [quoting *Sekerak*, 1 F. Supp. 2d at 1199].) The court is pointedly nonplussed by Plaintiffs' peculiar reference to "heavy-handed uses of the spoils system." Political patronage is not at issue in this case.[25] Moreover, Plaintiffs once again fail to cite the record in support of the allegations raised in either of the two above-quoted, patently conclusory, wildly vague sentences. I repeat: "***unsupported conclusory allegations . . . do not create a genuine issue of***

---

[25]The plaintiff in *Sekerak* claimed, *inter alia*, that she faced retaliation at work for supporting a political candidate her supervisors opposed. 1 F. Supp. 2d at 1194–95. Thus arises the *Sekerak* court's reference to the "'heavy-handed uses of the spoils system.'" *Id.* at 1199 (quoting *Anthony v. Sundlun*, 952 F.2d 603, 605 [1st Cir. 1991]). This court is at an absolute loss as to why Plaintiffs quote this language in their brief.

*fact.*" *Annett*, 371 F.3d at 1237 (emphasis added).  Thus, the court disagrees with Plaintiffs'

assertion that they have "met their burden of showing a 'custom,' [sic] as to the City [and

County]."  (Pls.' Resp. at 42.)  Bald allegations of the existence of a municipal custom are not like

a magic bean.  Plaintiffs cannot simply plant them in their response to a motion for summary

judgment and hope they will sprout and grow into a genuine issue of material fact.[26]

    As noted above, to satisfy third element set forth in *Gates*, Plaintiffs must show not only

that a violation of the Constitution or federal law occurred, but also that the alleged custom was

"the moving force behind" the unconstitutional or illegal act that injured them.  *Gates*, 996 F.2d at

1041.  Not only have Plaintiffs failed to explain what precise custom on the part of the City and

County caused their injury, so too have they failed to come forward with any evidence showing

that any such custom was "the moving force behind" the alleged violations committed by DDHS

---

[26]Although they do not raise it with respect to their response to Defendants' summary judgment argument concerning the City and County, Plaintiffs' statement of facts included evidence that Plaintiffs McClenton and Dennis had complained to the Mayor of Denver of racial discrimination prior to the 2004 layoffs.  Plaintiff McClenton claims: "In November 2002, I met with the Mayor and complained about racial discrimination against myself."  (Pls.' Resp., Ex. 26 ¶ 17 [Aff. of C. McClenton].)  Further, in October 2003, Plaintiff Dennis claims to have written a letter to the Mayor of Denver complaining DDHS managers had discriminated against him on the basis of age, race, and gender.  (*Id.*, Ex. 7 at 55–56 [Dep. of E. Dennis].)  Plaintiffs do not allege that Plaintiffs Freeman or James ever complained of discrimination to anyone outside of DDHS.  (*See* Compl.; Pls.' Resp.)  Notwithstanding evidence that two complaints were made, Plaintiffs fail to state the precise nature of Plaintiff McClenton's or Plaintiff Dennis's respective communications with the Mayor.  Moreover, Plaintiffs fail to state how the City and County responded to the complaints.  To the questionable extent these complaints are relevant to Plaintiffs' vague assertion that the City and County had a discriminatory custom related to the 2004 layoffs, I find these two complaints (both of which significantly predate the layoffs) to be patently insufficient to support a reasonable finding based thereupon that the Mayor's office, and therefore, the City and County of Denver, acted with "[d]eliberate indifference to or tacit approval of" the conduct complained of in the instant case.  *See Gates*, 996 F.2d at 1041.

employees.[27]  (*See* Pls.' Resp, *passim*.)  To the contrary, Plaintiffs' own evidence demonstrates the City and County of Denver created Career Services Board grievance policies through which Plaintiffs could and did appeal their layoffs—at least until they were counseled to abandon those appeals and file suit in this court.  (*Id.* at 44–45).  Moreover, Plaintiffs' own assertions indicate *the moving force* behind the constitutional and statutory violations Plaintiffs allege was the "insidious," "malicious" discrimination of Defendant White and her DDHS layoff conspiracy cohorts.  (*See e.g.*, *id.* at 48–49.)  In light of all of the foregoing, Plaintiffs have overwhelmingly failed to come forward with evidence that raises a genuine issue of fact concerning whether the City and County of Denver had a municipal custom that ran afoul of the constitution or federal law.  Accordingly, I must grant summary judgment in favor of the City and County.

> ### (b)   *Plaintiffs' Failure to Aver Facts Sufficient to Support a Section 1983 Claim Also Defeats Their Section 1981 Claims*

According to Defendants, Plaintiffs' failure to demonstrate that the City and County of Denver is liable under section 1983 also extends to Plaintiffs' section 1981 claims against the City and County.  (Defs.' Br. at 22.)  I agree.  Section 1981(a) provides: "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a) (2006).  Section 1981 does not contain any provisions concerning the enforcement of the rights created therein.  *See id.*

---

[27]Further, even if Plaintiffs had come forward with evidence to raise an issue of fact, DDHS is an arm of the state of Colorado.  *See Analysis* § 2a[i], *infra*.  Plaintiffs have failed to cite—and this court's research has failed to uncover—a case in which a municipality was held liable for actions committed by employees of an arm of the state.

§ 1981(a)–(c).  Thus, in *Jett v. Dallas Independent School District*, the Supreme Court determined that "the explicit remedial provisions of [section] 1983 [are] controlling in the context of damages actions brought against state actors alleging violation of the rights declared in [section] 1981."  491 U.S. 701, 731 (1989).  Subsequent to the *Jett* decision, Congress passed the Civil Rights Act of 1991, under which the entirety of former section 1981 became the current subsection 1981(a), and subsections (b) and (c) were added.  *See* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended in scattered sections of 42 U.S.C.).

Subsection (c) provides in relevant part: "The rights protected by this section are protected against . . . impairment under color of State law."  42 U.S.C. § 1981(c) (2006).  While some circuits have read subsection (c) to overrule *Jett* by authorizing a private right of action against municipalities, *see, e.g.*, *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1210 (9th Cir. 1996), the Tenth Circuit has rejected this view: "We . . . conclude that even after the 1991 amendments to [section] 1981, damages claims against state actors for [section] 1981 violations must be brought under [section] 1983."  *Bolden*, 441 F.3d at 1137.  In light of my determination that Plaintiffs have failed to come forward with evidence of an official custom to support their section 1983 claims against the City and County, summary judgment is also warranted with respect to Plaintiffs' section 1981 claims against the same defendant. Accordingly, Plaintiffs' section 1981 claims against the City and County of Denver must be dismissed.

### iii.   *Qualified Immunity: Individual Capacity Claims Against Defendant White*

#### (a)   *Untimely Allegations of Retaliation*

Defendants raise the affirmative defense of qualified immunity with respect to Plaintiffs'

claims against Defendant White in her individual capacity.  (Defs.' Br. at 24–25.)  In response,

Plaintiffs assert "[t]he right to be free from retaliation for exercising rights protected by [section]

1981 is clearly established by the Civil Rights Act of 1991."  (Pls.' Resp. at 47.)  Defendants

object to this assertion, claiming that Plaintiffs "never raised a claim of retaliation in their

[c]omplaint."  (Defs.' Reply at 40.)  I endorse Defendants' objection.  In their complaint, Plaintiffs

hardly put Defendants on notice of claims for retaliatory discharge; instead, Plaintiffs allege

intentional racial discrimination: "The terminations and demotions of [P]laintiffs were in violations

[sic] of their rights to due process and equal protection . . . in that the decisions were made with

race as a significant factor."  (Compl. ¶ 132.)  Elsewhere in their complaint, Plaintiffs similarly

allege that: (1) they seek to recover "for the deprivation of [their] constitutional rights and race

discrimination against them in their discharge by [Defendants];" (2) "[I]n implementing the

demotions and layoffs, [] Defendants used a variety of methods to . . . eliminate African American

managers and supervisors from the department;" (3) "The layoff process was manipulated in a

subjective manner to eliminate Plaintiffs' positions or demote them;" and (4) "[P]laintiffs were

discriminated against based on their race, African American."  (*Id.* ¶¶ 1, 24, 25, 32).  Although

Plaintiffs are correct that claims for retaliation may be made out under section 1981, *see, e.g.*,

*Foley v. University of Houston System*, 355 F.3d 333, 339 (5th Cir. 2003), Plaintiffs' sudden

assertion that their layoffs were retaliatory—rather than or in addition to being discriminatory—arises for the first time in their response to Defendants' motion for summary judgment.[28]  (*See* Defs.' Reply at 40.)  As discussed below, asserting a new theory for recovery after the close of discovery is untimely, unexplained, and abusive, even in light of the broad notice pleading standards set forth in the Federal Rules of Civil Procedure.

Courts may treat new claims raised in a plaintiff's opposition to summary judgment as a motion to amend the complaint pursuant to Federal Rule of Civil Procedure Fifteen.  *See* Fed. R. Civ. P. 15 (2006); *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998). Generally, a plaintiff ought not be prohibited to pursue a valid claim due to the plaintiff's failure to set forth in the complaint a theory upon which he could recover, so long as the "'late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.'" *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1219 at 194 [1990]).  Indeed, the Tenth Circuit has held that "the purpose of 'fact pleading,' as provided by [Federal Rule of Civil Procedure] 8(a)(2), is to give the defendant fair notice of the claims against him without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed. . . ." *Evans*, 936 F.2d at 1091.  Notably, this pleading standard, although liberal, does not "permit plaintiffs to wait until

---

[28]Defendants aptly accuse Plaintiffs of "tap dancing" around and playing a "shell game" with their allegations.  (Defs.' Reply at 42, 44.)  The court prefers to envision the collective body of Plaintiffs' factual and legal allegations as an agitated sounder of wild boar, charging and attacking willy-nilly, sowing unreality and illogic, and shredding any modicum of cogency set in their erratic path.  (*See* Pls.' Resp.)

the last minute to ascertain and refine the theories on which they intend to build their case." *Id.* If permitted, this practice "would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances." *Id.*

Here, Plaintiffs offer no explanation as to why this court should allow an amendment by implication at this stage in the case. It is difficult to ascertain—and Plaintiffs make no argument to aid the court in its endeavor—why Plaintiffs could not have presented their theory in a more timely manner. It is well settled in the Tenth Circuit that "untimeliness alone is a sufficient reason to deny leave to amend, especially when the party filing the motion has furnished no adequate explanation." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (citing *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1462 [10th Cir. 1991]; *Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 [10th Cir. 1990]; *First City Bank v. Air Capitol Aircraft Sales*, 820 F.2d 1127, 1133 [10th Cir. 1987]). Plaintiffs' proposed amendment by implication is unjustifiably untimely and is therefore denied.

### (b)     *Qualified Immunity: Plaintiffs Failed to Adequately Allege Defendant White Violated Their Rights*

Moreover, even had Plaintiffs raised claims for retaliatory discharge in their complaint, Defendants rightly point out that Plaintiffs have nevertheless failed to satisfy the burden that shifted to them upon Defendants' assertion that Defendant White is entitled to qualified immunity. (Defs.' Br. at 24–25.) The doctrine of qualified immunity shields government officials from individual liability when they are performing discretionary functions that do not violate clearly

established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (citations omitted) (emphasis in original). Whether a defendant is entitled to qualified immunity is a question of law. *Derda v. City of Brighton*, 53 F.3d 1162, 1164 (10th Cir. 1995).

Once a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of demonstrating that: (1) the defendant's alleged actions violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established at the time of the alleged violation. *Trigalet v. Young*, 54 F.3d 645, 647 (10th Cir. 1995) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 [10th Cir. 1995]). A plaintiff's burden at this stage has been described as "quite heavy," as it is insufficient to simply allege a violation of a general legal principle. *See Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996). In order to discharge this burden, a plaintiff must do more than simply identify in the abstract a clearly established right and allege that the defendants have violated it. *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1998). Rather, a plaintiff *must* "articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity, and demonstrate a 'substantial correspondence between the conduct in question and prior law . . . establishing that the defendant's actions were clearly prohibited.'" *Id.* (quoting *Hovater v. Robinson*, 1 F.3d 1063, 1066 [10th Cir. 1993]) (alteration in original) (further citations omitted); *accord Baptiste v. J.C.*

*Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998).  "'Unless such a showing is made, the

defendant prevails.'"  *Romero*, 45 F.3d at 1475 (quoting *Pueblo Neighborhood Health Ctrs. v.

Losavio*, 847 F.2d 642, 645 [10th Cir. 1988]) (further citation omitted).

In the case *sub judice*, Plaintiffs fail to articulate a legal standard against which to judge

the wrongful conduct they assert Defendant White to have committed.  (*See* Pls.' Resp. at

46–50.)  Indeed, other than their vague, untimely assertion that Defendant White violated

Plaintiffs' "right to be free from retaliation" under section 1981, Plaintiffs fail to respond to the

qualified immunity defense by asserting that Defendant White violated *any* clearly established

constitutional or statutory right.  *See Trigalet*, 54 F.3d at 647.  Plaintiffs do not even bother to

furnish the legal test for discriminatory retaliation under section 1981, let alone *mention* the claims

that they actually plead against Defendants in their complaint.  (*See* Pls.' Resp. at 47; *c.f.* Compl.

¶¶ 128–29, 132 [alleging racial discrimination, equal protection violations, and deprivations of

property interests].)  Such a woefully inadequate effort hardly satisfies the heavy burden placed

upon a plaintiff seeking to subject a civil servant to personal liability.  *See Watson*, 75 F.3d at 577;

*see also Hannula*, 907 F.2d at 130 ( stating heavy burden is justified because suits against

government officials distract such officials from their responsibilities, inhibit discretionary decision

making, and deter able people from public service).  Although I am inclined to grant summary

judgment on the issue of Defendant White's immunity on this basis alone, I proceed to evaluate

Plaintiffs' factual allegations in order to emphasize Plaintiffs' dramatic failure to demonstrate any

discriminatory or retaliatory conduct on the part of Defendant White.

**(b)      Qualified Immunity: Plaintiffs Have Failed to State Any Specific Discriminatory Actions Conducted by Defendant White**

Defendants argue Plaintiffs failed to provide any factual support for their allegations that Defendant White violated their clearly established rights.  (Defs.' Reply at 48.)  I agree.  Below, I address the patent evidentiary insufficiency of Plaintiffs' attempt to demonstrate that any conduct effectuated by Defendant White was impelled by discriminatory animus.

I pause here to note the difficultly posed by this endeavor.  At no point in their argument in response to Defendants' motion for summary judgment do Plaintiffs bother to cite the record.  (Pls.' Resp. at 36–55.)  Instead, Plaintiffs tasked the court with comparing the allegations contained in their arguments with the facts set forth in the parties' various statements of facts.[29] This court was not impressed with the results of its comparison.  While Plaintiffs did at times rely on facts borne out by the record, it appears that they frequently relied on their imagination when the record failed to yield facts favorable to their arguments.

**(i)      Plaintiff James**

Plaintiffs claim that Plaintiff James was laid off in retaliation for her prior complaints of racial mistreatment.  (*Id.* at 48.)  Specifically, Plaintiffs allege that after Plaintiff James met with Defendant White to complain about "racial mistreatment," Defendant White transferred Plaintiff James "to a place under the wing of her favorite layoff conspirator . . . [Mr.] Morein."  (*Id.*)

---

[29]This task is *further* complicated by the fact that Plaintiffs inappropriately raised numerous factual contentions in connection with their inapposite denials (offered in great abundance) of facts proffered by Defendants.

Plaintiffs further allege that Defendant White transferred Plaintiff James, knowing "the budget numbers and the need for continued layoffs." (*Id.*)

The record fails to substantiate Plaintiffs' conspiracy theory. First, the record fails to demonstrate that Plaintiff James ever met with Defendant White to complain about "racial mistreatment." Instead, Plaintiff James merely alleges she met with Defendant White on an unspecified date to complain about disciplinary actions taken against her. (*See id.*, Ex. 6 ¶¶ 18–19 [Dep. of G. James] [alleging conversation with Defendant White regarding "punitive transfer[s]" and "being improperly disciplined and put on unpaid leave"].) Indeed, nothing in Plaintiff James's affidavit suggests that she discussed with Defendant White any potential connection between racism and the disciplinary actions taken against her. (*Id.*)

Additionally, Plaintiffs admit that in November or December 2003 Plaintiff James *specifically requested to be transferred to Mr. Morein's division*. (Defs.' Br., Statement of Undisputed Facts ¶ 97; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 97.) Thus, even assuming Plaintiff James had complained of racial discrimination instead of "poor treatment" and further assuming that such complaints were made *before* she requested her transfer to Business Management (a fact Plaintiffs fail to allege), the conduct at the core of Plaintiffs' allegations against Defendant White is her decision to grant Plaintiff James's request for a transfer—some *seven months* prior to the 2004 layoffs. (Pls.' Resp. at 48.) Plaintiffs fail to come forward with a shred of evidence in support of their allegation that Defendant White knew of "the need for continued [DDHS] layoffs" when she granted Plaintiff James's request to transfer to Business Management. (*Id.* at 48–49.) Even if Plaintiffs had come forward with such

evidence, Plaintiffs also fail to provide any evidence that Defendant White knew "the need for continued layoffs" would necessitate layoffs in the Business Management Division.

In light of the foregoing, Plaintiffs have failed to furnish a factual context necessary to give rise to a reasonable inference of discriminatory animus on the part of Defendant White. Accordingly, I find Plaintiffs have failed to articulate with any degree of specificity anything Defendant White did that violated Plaintiff James's right to be free from discrimination or retaliation. *See Romero*, 45 F.3d at 1475 (requiring plaintiff to articulate defendant's wrongful conduct with specificity).

### (ii)     *Plaintiff Dennis*

Plaintiffs make only a scattered, haphazard effort to point to any of Defendant White's conduct that may have violated Plaintiff Dennis's constitutional or statutory rights. *See id.*  First, Plaintiffs assert that Plaintiff Dennis met at some unspecified time with Defendant White to discuss "racial mistreatment."  (Pls.' Resp. at 48.)  Next, Plaintiffs make the unsupported assertion that Defendant White maliciously "[m]anipulated . . . [Plaintiff] Dennis into [a] perilous placement[] with a smile on face [sic] . . . ."  (*Id.* at 49.)  Presumably, Plaintiffs see some connection between: (1) Plaintiff Dennis's complaints to Defendant White; and (2) Plaintiff Dennis's "perilous placement" in a division from which he was later laid off.

Plaintiffs neglect to mention that in October 2003, Plaintiff Dennis requested and received a transfer into the Family and Children's Services Division.  (Defs.' Br., Statement of Undisputed Facts ¶¶ 106–07; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 106–07.)  Plaintiffs do not mention it here, but Plaintiff Dennis has asserted that

he requested the transfer—which Defendant White granted—because he felt he faced racially discriminatory treatment in his previous division.  (Pls.' Resp., Ex. 7 at 54–55 [Dep. of E. Dennis].)  Although Plaintiff Dennis believes Defendant White "knew or should have known" when she granted Plaintiff Dennis's request for a transfer to Family and Children's Services in October 2003 that there would be a layoff in July 2004, Plaintiff Dennis admitted in deposition that he had no evidence to support his belief.  (Defs.' Br., Statement of Undisputed Facts ¶ 110; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 110.)  Nor have Plaintiffs come forward with any evidence to that effect.[30]  Thus, Plaintiffs have failed to state with specificity any conduct on the part of Defendant White that violated Plaintiff Dennis's right to be free from discrimination or retaliation.  *See Romero*, 45 F.3d at 1475.

### (iii)    *Plaintiff Freeman*

In order to demonstrate Plaintiffs' total failure to state with specificity any discriminatory conduct that Defendant White perpetrated vis-à-vis Plaintiff Freeman, I quote the entirety of Plaintiffs' argument pertaining thereto (recall that Plaintiff Freeman directed the Adult Services Division when it was combined with the FER division, which was directed by Juanita Sanchez):

> With respect to [Plaintiff] Freeman, [Defendant] White's behavior was even more insidious.  [Defendant] White went to absurd length [sic] in her deposition to try to justify and rehabilitate the white male domestic violence perpetrator she arranged

---

[30]Nevertheless, Plaintiffs assert that "the record reflects" Plaintiff Dennis's belief.  (Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 110 [citing Pls.' Resp., Ex. 4 at 22 (Dep. of R. White)].)  The only relevant fact that the record to which Plaintiffs cite could be said to reflect, however, is Plaintiffs' boundless inclination to misrepresent the record.  (*See id.*, Ex. 4 at 22 [Dep. of R. White] [discussing the 2004 layoffs, but not discussing when Defendant White learned such layoffs would be required].)  Plaintiffs' assertion is rejected.

> to hire into the **Family and Children Division** [sic] Here was someone who did not disclose to the DDHS interview panel that was screening him the fact that he'd [sic] been arrested on a felony domestic violence charge and convicted on a misdemeanor domestic violence charge and is applying to run the [s]tate's largest city's **Family and Childrens** [sic] social service program.
>
> The evidence was that [Defendant] White knew full well that under CBMS there would only be one Director of the joined FER and Adult Services Divisions, and that given the obvious seniority of Juanita Sanchez (almost [twenty year's service, as opposed to about [nine] for [Plaintiff] Freeman), the only place for [Plaintiff] Freeman was in the place [Defendant] White was reserving for her violent, abusive male applicant.  Her claims that she would have welcomed [Plaintiff] Freeman to have applied are just that, claims a jury should weigh.

(Pls.' Resp. at 49 [emphases in original] [no citations omitted].)  Although Plaintiffs do not allege

the fact here, the court understands that prior to being switched into her position in Adult

Services by Defendant White's predecessor, Plaintiff Freeman was Director of the Family and

Children's Division.  (*Id.*, Ex. 18 at 40 [Dep. of V. Brooks].)  Thus, the court ascertains

Plaintiffs' argument to be that Defendant White discriminated against Plaintiff Freeman by either:

(1) hiring a "violent, abusive male applicant" *for a job for which Plaintiff Freeman did not apply*;

or (2) hiring, in early 2004, a "violent, abusive male applicant" to fill a position that, subsequently,

Plaintiff Freeman could not bump into during the layoffs because it was no longer vacant.  (*See*

*id.*, Ex. 18 at 40 [Dep. of V. Brooks] [noting that the Family and Children's Division Director

position was filled in early 2004].)  Adding insult to inanity, Plaintiff Freeman *sat on the panel*

that interviewed the so-called "violent, abusive male applicant," and thought that he was an

acceptable candidate for the job.  (Defs.' Reply, Ex. A–56 at 95–96 [Dep. of C. Freeman]; *see*

*also* Pls.' Resp., Ex. 18 at 43–44 [Dep. of V. Brooks].)  Thus, I find that Plaintiffs' allegations fail

to state any conduct on the part of Defendant White that violated Plaintiff Freeman's right to be free from discriminatory or retaliatory treatment.  *See Romero*, 45 F.3d at 1475.

### *(iv)    Plaintiff McClenton*

First, Plaintiffs assert that Plaintiff McClenton was entitled to "'special qualifications' protection" because she was the only person at DDHS qualified for her position as the "Veteran's Service Officer." (Pls.' Resp. at 49.)  Second, Plaintiffs assert that Plaintiff McClenton's layoff violated state law concerning services for veterans. (*Id.*)  Characteristically, Plaintiffs fail to indicate what law the layoff violated or how a violation thereof might be relevant to the instant case. (*Id.*)  I reject this second assertion summarily because Plaintiffs elsewhere admitted: "The duties [Plaintiff] McClenton performed in the veterans [sic] program are mandated by statute, but her position as Program Administrator is not mandated." (Defs.' Br., Statement of Undisputed Facts ¶ 87; *admitted at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 87.)

Plaintiffs admitted that Plaintiff McClenton was bumped from her position by a DDHS employee, who is also a veteran, with eleven years more seniority than she. (*Id.*, Statement of Undisputed Facts ¶¶ 93–94; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 93–94.)  Nevertheless, as noted above, Plaintiff McClenton asserts she should have been accorded the protection of a "special qualifications" classification based on the fact that "she was the only employee who dealt with veterans or who knew anything about them." (Pls.' Resp. at 49.)  The record reflects that special qualifications protection may have been granted to certain Spanish language speakers at DDHS. (*See id.*, Ex. 13 at 72 [Dep. of P. Garritt].)  Plaintiffs assert "it became clear through the testimony of *C[areer] S[ervice]*

A*[uthority]* employee, Peter Garritt, that bilingual speakers were *not* the only recipients of 'special qualifications' protection and that DDHS had protected another worker simply because of his unique job skills." (*Id.* at 49–50 [emphases in original] [no citation provided].)  Regardless of the veracity of this unsupported allegation, Plaintiffs do not assert that Defendant White had any involvement in the determination whether Plaintiff McClenton, or any other employee affected by the layoff, was entitled to special qualifications protection. (*Id.*, *passim.*)  Plaintiffs do not dispute that Valerie Brooks made the decision to eliminate three Program Administrator positions in her division and that Plaintiff McClenton was among those Program Administrators with the least seniority. (Defs.' Br., Statement of Undisputed Facts ¶¶ 77, 79–80; *admitted in relevant part at* Pls.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 77, 79–80.)  Thus, even assuming, *arguendo*, that Plaintiff McClenton was entitled to special qualifications protection and Valerie Brooks denied Plaintiff McClenton such protection based on racial discrimination, Plaintiffs would still have failed to allege any specific facts demonstrating conduct on the part of Defendant White that violated Plaintiff McClenton's right to be free from such discrimination. *See Monell*, 436 U.S. at 691 (stating "a municipality cannot be held liable under [section] 1983 on a *respondeat superior* theory"); *Romero*, 45 F.3d at 1475.

   Finally, Plaintiffs appear to allege that Plaintiff McClenton's discharge was also in retaliation for her past complaints of racial discrimination. (Pls.' Resp. at 48 [stating that three Plaintiffs had complained of racial discrimination, but only naming Plaintiffs Dennis and James].)  It is true that Plaintiff McClenton claims to have made complaints of racial discrimination in November 2002. (*Id.*, Ex. 26 ¶ 17 [Aff. of C. McClenton], Statement of Additional Disputed

Facts ¶ 85; *objected to as irrelevant at* Defs.' Reply, Resp. to Statement of Additional Disputed

Facts ¶ 85.)  Plaintiffs fail, however, to come forward with any evidence demonstrating that

Defendant White, who became DDHS's manager in April 2003, either: (1) knew of such

complaints; or (2) took any action whatsoever in retaliation thereof in connection with the July

2004 layoffs.  (*See id.*, *passim.*)  Indeed, Plaintiff McClenton acknowledged the profound

weakness in her case in deposition:

> Q:   [N]ow that we've gone through . . . the layoff rule, and now that we've
> gone through the layoff plan, tell me how your layoff was discriminatory on
> the basis of race.
>
> A.   I don't know.

(*Id.*, Ex. A–34 at 58 [Dep. of C. McClenton].)  Thus, I find that Plaintiffs have not satisfied the

burden that shifted to them when Defendants asserted that Defendant White is entitled to qualified

immunity with respect to Plaintiff McClenton's claims.  *See Romero*, 45 F.3d at 1475.

### (c)     *Qualified Immunity: Conclusion*

In light of the foregoing, there is no question Plaintiffs have failed to meet the burden that

shifted to them when Defendants asserted the affirmative defense of qualified immunity.  *See id.*

(stating plaintiff *must* articulate the constitutional or statutory right violated and state, with

specificity, the defendant's conduct that has allegedly violated this right).  Once the burden shifted

to them, Plaintiffs failed to articulate with any precision the right they allege to have been

violated, other than a right to be free from retaliatory discharge.  As explained above, Plaintiffs'

claims of retaliation, in addition to being factually unsupported, were also raised in an untimely

manner.  More importantly, Plaintiffs have categorically failed to provide this court with anything

more than incomplete arguments predicated on conclusory allegations to support their contention

that Defendant White discriminated or retaliated against them.  Accordingly, I must grant

summary judgment in favor of Defendants on Plaintiffs' individual capacity claims against

Defendant White.

> **b.**      **Pro se *Plaintiffs' Claims***

*Pro se* Plaintiffs failed to respond to Defendants' motion for summary judgment.  The

Tenth Circuit has instructed that "a party's failure to file a response to a summary judgment

motion is not, by itself, a sufficient basis on which to enter judgment against the party."  *Reed v.*

*Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).  Rather, the court must still determine that

judgment for the moving party is "appropriate" under Federal Rule of Civil Procedure Fifty-six.

*Id.*  Summary judgment under Rule Fifty-six is appropriate "only if the moving party demonstrates

that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."

*Id.*  Nonetheless, by failing to respond to a summary judgment motion, a party waives the right to

controvert the facts asserted therein.  *Id.*  Consequently, in analyzing Defendants' motion, this

court must accept as true all material facts asserted by Defendants and properly supported in their

motion.  *Id.*

Accordingly, *Pro se* Plaintiffs' claims against DDHS and Defendant White in her official

capacity fail because Defendants have provided evidence sufficient to support my finding that *Pro*

*se* Plaintiffs' claims against DDHS, an arm of the state of Colorado, and Defendant White, acting

in her official capacity as DDHS's Manager, are barred by the Eleventh Amendment.  *See*

*Analysis* § 2a[i], *supra*.  Further, *Pro se* Plaintiffs' claims against the City and County of Denver

must also fail because Defendants have demonstrated an absence of evidence of a municipal policy

or custom that was the moving force September 27, 2006behind the harms *Pro se* Plaintiffs claim

to have suffered. *See Analysis* § 2a[ii], *supra*.

      Finally, *Pro se* Plaintiffs' claims against Defendant White in her individual capacity must

fall because *Pro se* Plaintiffs have failed to satisfy the burden that shifted to them when

Defendants asserted the affirmative defense of qualified immunity. *See Analysis* § 2a[iii](b),

*supra*. A brief review of Defendants' well-supported factual proffers substantiates the conclusion

that summary judgment is appropriate because there is no genuine issue of material fact regarding

Defendant White's entitlement to the protection of the defense of qualified immunity. *See Reed*,

312 F.3d at 1195; *see also Romero*, 45 F.3d at 1475 (requiring plaintiff seeking to overcome

defense of qualified immunity to articulate defendant's wrongful conduct with specificity).

      First, I address the facts relating to *Pro se* Plaintiff Smith. Indeed, Defendants' briefs

highlight the paucity of evidence that *anyone* at DDHS discriminated against Plaintiff Smith. (*See*

Defs.' Br.; Defs.' Reply.) As stated in Defendants' brief and properly supported by Defendants'

citation to the factual record, it was IT Director Mark Brazwell, who is an African American, who

decided to abolish an Associate IT Developer in his division. (Defs.' Br., Statement of

Undisputed Facts ¶¶ 39, 112, *deemed admitted.*) Mr. Brazwell's decision to eliminate positions in

his division was based on the functions assigned to the positions he abolished, not the persons

who held the positions. (*Id.*, Statement of Undisputed Facts ¶ 113, *deemed admitted.*) *Pro se*

Plaintiff Smith, whose position was eliminated, had the shortest length of service of the six

employees who were Associate IT Developers. (*Id.*, Statement of Undisputed Facts ¶ 114,

-55-

*deemed admitted.*)  Accepting, as I must, these supported factual proffers as true, *see Reed*, 312 F.3d at 1195, *Pro se* Plaintiff Smith's claims against Defendant White fail because of an absence of specific facts demonstrating discriminatory conduct on the part of Defendant White—or anyone at DDHS—perpetrated against *Pro se* Plaintiff Smith.  *See Romero*, 45 F.3d at 1475.

I now address the facts relating to *Pro se* Plaintiff Lewis.  As stated in Defendants' brief and supported by Defendants' citation to the factual record, Valerie Brooks made the decision to eliminate three Program Administer positions in the newly combined Adult Services and FER Division.  (Defs.' Br., Statement of Undisputed Facts ¶¶ 77, 79, *deemed admitted.*)  At the time she made the decision, Ms. Brooks did not know who occupied the abolished positions.  (*Id.*, Statement of Undisputed Facts ¶ 78, *deemed admitted.*)  Plaintiff Lewis's position was abolished because she had less seniority than the Program Administrators whose positions were not abolished.  (*Id.*, Statement of Undisputed Facts ¶ 80, *deemed admitted.*)  Accepting, as I must, these supported factual proffers as true, *see Reed*, 312 F.3d at 1195, *Pro se* Plaintiff Lewis's claims against Defendant White fail because of an absence of specific facts demonstrating conduct on the part of Defendant White—or anyone at DDHS—that could reasonably be construed to constitute intentional racial discrimination perpetrated against *Pro se* Plaintiff Lewis.  *See Romero*, 45 F.3d at 1475.

### 3.    *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.    Defendants' motion (#46) is GRANTED.

The clerk shall forthwith enter judgment in favor of Defendants and against Plaintiffs, dismissing Plaintiffs' claims with prejudice.  Defendants may have their costs by filing a bill of costs within eleven days of the date of this order.

Dated this 28th day of September, 2006

BY THE COURT:


s/Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge